*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* TERRELL/EVANS-TERRELL, Minors.

UNPUBLISHED
July 17, 2026
2:38 PM

No. 376074
Oakland Circuit Court
Family Division
LC No. 2020-882006-NA

Before: MALDONADO, P.J., and RIORDAN and YOUNG, JJ.

PER CURIAM.

Respondent appeals as of right the trial court's order terminating her parental rights to her four children, K1, K2, K3, and K4[1], under MCL 712A.19b(3)(b)(*i*), (c)(*i*), and (j). A preponderance of the evidence supports the trial court's finding that termination of respondent's parental rights was in the best interests of K1, K2, and K3. With respect to K4, because the court did not properly consider this child's placement with fictive kin, the order terminating respondent's parental rights to this child is vacated, and the matter is remanded to the trial court for further consideration of K4's best interests.

## I. BACKGROUND

Respondent was 16 years old when she gave birth to her first daughter, K1, in 2015. K2 was born a year later, and K3 followed three years later. Between 2017 and 2019, Children's Protective Services (CPS) substantiated at least three complaints against respondent related to domestic violence, suitable housing, and physical abuse of K2.

In July 2020, respondent and the children were homeless, and she posted on Facebook "indicating that she and her children did not need to be on earth anymore." The Department of

---

[1] Respondent's fifth child was born in Wayne County in 2024. This child was not included in the Oakland County permanent custody petition and respondent's parental rights to this child are not at issue in this appeal.

Health and Human Services (DHHS) interviewed respondent and other family members and attempted to put a safety plan in place. According to DHHS, respondent gave permission for CPS to take her children and days after that DHHS filed a petition requesting that the trial court authorize the petition, take jurisdiction of K1, K2, and K3, and remove these children from respondent's care. The petition was authorized and, during the adjudication trial, the trial court found statutory grounds to assume jurisdiction over the children.

During the disposition that followed, the court ordered respondent to comply with a treatment plan designed to remove the barriers to reunification. Specifically, respondent was required to obtain and maintain suitable housing and a legal source of income. She was also required to participate in a psychological evaluation, comply with the recommendations that followed, and participate in mental health services. The court further ordered respondent to attend parenting classes, parenting time, and participate in the parent-partner program. When respondent gave birth to her fourth child, K4, in late 2020, the trial court took jurisdiction over K4 and, shortly thereafter, it ordered respondent to participate in and benefit from the treatment plan already established regarding the other three children.

Following the adjudication and disposition, respondent achieved enough stability that, in September 2021, the court permitted the children to return to respondent's home with family reunification services in place. However, this reunion proved to be brief. After only a month, the children were again removed from the home after respondent reported that she and the children were unhoused. Respondent's lack of suitable housing was related to an incident of domestic violence between respondent and BC, respondent's long-time, on-again, off-again boyfriend. Respondent admitted that she was both a victim and a perpetrator during the altercation with BC. The children were present during the incident.

After the children's removal in late 2021, respondent was given another two years to work toward reunification. During these years, respondent's compliance with the treatment plan was inconsistent. This time period was marked by additional domestic violence and events that highlighted respondent's emotional instability. Ultimately, in January 2024, DHHS petitioned the court to terminate respondent's parental rights. Following hearings in the summer and fall of 2024, the trial court found in October 2024 that there existed clear and convincing evidence to terminate respondent's parental rights to her four children under MCL 712A.19b(3)(b)(*i*), (c)(*i*), and (j). Then, after several hearings in early 2025, the trial court found in April 2025 that termination of respondent's parental rights was in the children's best interests. This appeal ensued.

## II. ANALYSIS OF THE ISSUE

On appeal, respondent does not challenge the trial court's findings that there existed clear and convincing evidence to terminate her parental rights under MCL 712A.19b(3)(b)(*i*), (c)(*i*), and (j). Instead, respondent objects to the trial court's determination that termination of her parental rights was in the children's best interests. We find no error in this regard relative to K1, K2, and K3. A preponderance of the evidence supports the trial court's finding that termination of respondent's parental rights was in the children's best interests of these three children. However, with respect to K4, we find that the court did not properly consider that child's placement with fictive kin in light of the definition of relative found in MCL 712A.13a(1)(j). Accordingly, the

order terminating respondent's parental right to K4 is vacated and the matter is remanded to the trial court for further consideration of K4's best interests.

## A. PARENTAL RIGHTS TO K1, K2, AND K3

"If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). When considering whether termination of parental rights is in a child's best interests, a court may consider a variety of factors. *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014). These factors include the bond between the child and the parent, the parent's ability to parent the child, the child's need for permanency and stability, the advantages of a foster home over the parent's home, the parent's compliance with the treatment plan, the parent's visitation history with the child, the child's well-being, and the possibility of adoption. *Id*. at 713-714. In addition, the trial court should consider the child's safety, including the risk of harm a child might face if returned to the parent's care. See *In re VanDalen*, 293 Mich App 120, 14; 809 NW2d 412 (2011). The court may also consider psychological evaluations, the child's age, continued involvement in domestic violence, and a parent's past history. *In re Jones*, 286 Mich App 126, 131; 777 NW2d 728 (2009).

"The trial court should weigh all the evidence available to determine the children's best interests." *In re White*, 303 Mich App at 713. The court's focus must be on the child and not the parent. *In re Moss*, 301 Mich App 76, 87; 836 NW2d 182 (2013). Of note, when more than one child is involved, a trial court must consider each child's best interests separately. *In re Olive/Metts*, 297 Mich App 35, 42; 823 NW2d 144 (2012). A trial court need not, however, make "individual" and "redundant factual findings" if the children's interests do not significantly differ. *In re White*, 303 Mich App at 715-716. Further, in the majority of cases, it is in the child's best interests to be placed with his or her siblings. *In re Olive/Metts*, 297 Mich App at 41-42.

Although the children shared many of the same needs and interests, they were not similarly situated in every respect. The trial court recognized the differing attributes between the children, and, it considered the best interests of each child individually in its opinion. Moreover, the court also recognized that there were common elements pertinent to evaluating the best interests of each child. In the end, the trial court engaged in a comprehensive analysis of the factors, and it did not clearly err when it found that termination of respondent's parental rights was in each child's best interests.

The trial court considered respondent's parenting ability and the children's safety and well-being and found that these related factors weighed in favor of terminating respondent's parental rights. The court did not err in this regard. The children came into care, in part, because of respondent's emotional and mental instability. Despite being offered services, respondent had not adequately addressed her mental health issues. In turn, respondent's emotional instability impaired her ability to safely parent her children. The preponderance of the evidence showed that the children would not be safe in respondent's care.

During the length of time that the children were wards of the court, respondent was offered many services designed to remove the barriers to reunification. Despite multiple referrals over

several years, respondent did not consistently participate in and benefit from the mental health treatment. Respondent refused to meaningfully engage in individual therapy and she did not comply with the recommended medication regime. As a consequence, respondent did not adequately address her mental health issues and she did not achieve the emotional and mental stability necessary to safely parent her children.

After evaluating respondent in 2021 and then again in 2024 in anticipation of the best-interest hearing, the court's clinical psychologist, Kathy Spatafora, found that, at the time of termination, respondent was not emotionally stable. If there was any doubt in this regard, respondent's own actions during the evaluation and later in the court proceedings provided compelling evidence that respondent was not stable enough to parent her children. During the interview portion of Spatafora's evaluation in late 2024, respondent became emotional, cried, and elevated her voice to a level that caused the other clinic employees to become concerned. Similarly, during the best-interest hearing, the caseworker's testimony clearly upset respondent. Respondent was unable to appropriately regulate her emotions. Tensions escalated to the point where respondent could not control her outbursts and she ultimately threatened the caseworker in open court. These were two examples of respondent's difficulty in regulating her emotions and employing appropriate coping skills. These issues have a clear connection to respondent's ability to properly parent her children. For example, Spatafora explained that respondent's behavior was damaging to the children because it modeled inappropriate coping skills.

Moreover, it was clear that respondent's inability to regulate her emotions and behaviors had already negatively impacted the children, who witnessed respondent lash out aggressively toward others. When these events occurred, one child would hide in a closet or go outside. The child expressed fear that she would at some point be the recipient of respondent's anger.

Further, Spatafora opined that respondent lacked insight into how her actions negatively impacted the children. As a consequence, it was unlikely that respondent would be motivated to change her behaviors. Respondent was clearly unwilling or unable to make meaningful changes to establish the stability necessary to properly parent her children and provide them with a safe and stable home environment. Accordingly, the trial court did not err when it concluded that respondent's parenting ability, and the children's safety and well-being, were factors that weighed in favor of terminating respondent's parental rights.

This is not to say respondent did nothing or made no progress. At the time of termination, respondent had made some effort to participate in services. She obtained suitable housing, had attended a few therapy sessions, and another court had permitted respondent's newborn to remain in her care. However, in many other respects, respondent still had not achieved the stability required to care for her four other children with various special needs. Despite representation to the contrary on appeal, respondent did not have employment at the time of the best-interest hearing. Respondent had moved to another county and acknowledged that she was not familiar with the county and the services that might be available. She had not yet found childcare for the one child in her custody. Moreover, respondent's minimal efforts occurred after DHHS filed the amended permanent custody petition in January 2024. There is little evidence that respondent's three- or four-month partial compliance with the treatment plan represented a forward trend. This is particularly true considering respondent's lack of progress during the four years the children were

in care. Instead, respondent's actions were consistent with her behavior throughout these proceedings.[2]

Respondent also asserts that the trial court did not properly weigh the existence of the parent-child bond when assessing the children's best interests. We disagree. The court considered the nature of the bond between respondent and her children and properly concluded that the poor bond was a factor that weighed in favor of terminating respondent's parental rights. This finding was supported by a preponderance of the evidence. Spatafora acknowledged that a strong bond existed between respondent and the children, specifically, K1 and K2. However, the children's expressed desire to protect respondent suggested that the bond was unhealthy. Moreover, Spatafora opined that if the children were returned to respondent's care, in light of their need to protect their mother, they would not report exposure to dangerous situations. Regarding the two younger children, Spatafora opined that any bond that existed with respondent was minimal. In general, the existence of a bond is a factor that would weigh in favor of preserving a respondent's parental rights. However, considering the record, it is clear that the *nature* of the parent-child bond was a factor that weighed in favor of terminating respondent's parental rights.

The trial court properly considered respondent's history of domestic violence when evaluating the children's best interests. Respondent argues that because she completed a domestic violence program and there had been no reports of any incidents in the year preceding the termination hearing, this was a factor that should have weighed in favor of preserving her parental rights. We disagree. Respondent's argument ignores evidence that if the children were returned to respondent's care, there was a very real possibility that they would be exposed to domestic violence in the future. Spatafora testified that respondent minimized the domestic violence reported in this case, particularly domestic violence involving BC. During the clinic evaluation, respondent asserted that there was only verbal abuse during her relationship. Spatafora noted that this was inconsistent with other statements made by respondent. Spatafora then explained that minimizing the nature of the relationship after years of treatment raised concerns that the children, if returned to respondent's care, would be exposed to continued domestic violence. Spatafora's opinions, coupled with evidence that respondent continued to have contact with BC—indeed, she asked him to attend the best-interest hearing—supported a finding that domestic violence remained a concern in this case. Accordingly, this factor clearly weighed in favor of terminating respondent's parental rights.

The court also considered the children's need for permanence, stability, and finality and properly concluded that these factors weighed in favor of terminating respondent's parental rights. At the time of termination, K1 was nine years old, K2 was eight years old, K3 was five years old, and K4 was four years old. Except for a brief period when they were returned to respondent's care, the three oldest children had been out of the family home for four years. K4 had never lived with respondent and had been a ward of the court for her entire life. At the time of termination,

---

[2] A caseworker noted that respondent demonstrated a pattern of obtaining employment right before a court hearing, and then she would either lose or quit the job after the hearing.

the children had been in their respective placements for significant periods of time. The record established that the four children had known very little stability or permanence in their short lives. Termination of respondent's parental rights was the only avenue by which the children could be available for adoption. The record supports the court's finding that termination of respondent's parental rights would give the children the opportunity to achieve the stability, permanence, and finality they deserved. Accordingly, these factors weighed in favor of terminating respondent's parental rights.

Finally, when considering a child's best interests, the court may consider the advantages of a foster home over the parent's home. *In re Olive/Metts,* 297 Mich App at 42. Further, the trial court may consider the possibility of adoption. *In re White,* 303 Mich App at 713. The record demonstrated that the children were doing well in their placements and all of their needs were being met. By contrast, at no time during the years the children were wards of the court did respondent demonstrate that she was capable of parenting her children for the long term. Further, the children's respective caregivers had expressed an interest in adopting the child in their care. In this case, a preponderance of the evidence supported a finding that the homes provided by the various caregivers were preferable to respondent's home because they would provide the children with the care and support they required to facilitate their continued growth and development.

On this record, the trial court did not clearly err when it found that termination of respondent's parental rights to K1, K2, and K3 was in the children's best interests. Respondent was unable to ensure the children's safety and stability and that all of their needs would be met. Continuing the parent-child relationship would have been detrimental to the children's physical, educational, and emotional well-being. The court properly weighed the appropriate factors and, on balance, a preponderance of the evidence weighed in favor of terminating respondents' parental rights to K1, K2, and K3.

## B. PARENTAL RIGHTS TO K4

Because K4 was not similarly situated to her siblings in one significant respect, the trial court's decision regarding her best interests warrants additional analysis. Respondent argues that the court erred when it failed to consider whether K4's caregiver was a relative as defined by MCL 712A.13a(1)(j), and therefore whether K4's placement with this caregiver weighed against termination of respondent's parental rights. We agree.

Relative placement is a factor that weighs against termination of parental rights. *In re Olive/Metts,* 297 Mich App at 41-42. This is so because a relative caretaker may be open to allowing the parent to maintain a relationship with the child, and maintenance of that relationship may be in the child's best interests. *In re Mason,* 486 Mich 142, 168-169; 782 NW2d 747 (2010). However, while placement with a relative weighs against termination, it is not dispositive because a trial court "may terminate parental rights in lieu of placement with relatives if it finds that termination is in the child's best interests . . . ." *In re Olive/Metts,* 297 Mich App at 43. In any event, a trial court must expressly consider a child's placement with a relative. *In re CJM,* ___ Mich App ___, ____; ___ NW3d (2024) (Docket No. 367565); slip op at 4. The record before us shows that the trial court and the parties did not consider whether K4's placement with fictive kin constituted a relative placement under the pertinent statutory definition.

-6-

MCL 712A.13a(1)(j) was amended by 2022 PA 200, effective October 7, 2022. This statute now defines a "relative" as any adult who is:

(*i*) Related to the child within the fifth degree by blood, marriage, or adoption, including the spouse of an individual related to the child within the fifth degree, even after the marriage has ended by death or divorce, the parent who shares custody of a half-sibling, and the parent of a man whom the court has found probable cause to believe is the putative father if there is no man with legally established rights to the child.

(*ii*) Not related to a child within the fifth degree by blood, marriage, or adoption but who has a strong positive emotional tie or role in the child's life or the child's parent's life if the child is an infant, as determined by the department or, if the child is an Indian child, as determined solely by the Indian child's tribe. As used in this section, "Indian child" and "Indian child's tribe" mean those terms as defined in section 3 of chapter XIIB. [MCL 712A.13a(1)(j).]

The amendment to MCL 712A.13a(1)(j) expanded the definition of relative to include certain "fictive kin," specifically any "individual who is at least 18 years of age" and is "[n]ot related to a child within the fifth degree by blood, marriage, or adoption but who has a strong positive emotional tie or role in the child's life or the child's parent's life if the child is an infant, as determined by the department . . . ." MCL 712A.13a(1)(j)(*ii*).

During the proceedings, the court and the parties consistently referred to K4's caregiver as "fictive kin." But it was never clarified whether their use of "fictive kin" contemplated relative placement under the amended version of MCL 712A.13a(1)(j)(*ii*).

On remand, the trial court shall first determine if K4's caregiver was "a relative" under MCL 712A.13a(1)(j)(*ii*). If yes, the trial court should weigh that relative placement against terminating respondent's parental rights to K4.

As to K4, we vacate trial court's best-interest determination and remand for further consideration of K4's best interests, including an initial determination whether her placement is with a fictive kin caregiver under MCL 712A.13a(1)(j)(*ii*). In all other respects, we affirm. We do not retain jurisdiction.

/s/ Allie Greenleaf Maldonado
/s/ Michael J. Riordan
/s/ Adrienne N. Young